

**FOR PUBLICATION**

Signed and Filed: January 4, 2019

_____
**HANNAH L. BLUMENSTIEL**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | ) Case No. 13-30827 HLB |
| | ) |
| DAVID WILLIAM BARTENWERFER and | ) Chapter 7 |
| KATE MARIE BARTENWERFER, | ) |
| | ) |
| Debtors. | ) |
| _____ | ) Adv. Proc. No. 13-03185 HLB |
| KIERAN BUCKLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID WILLIAM BARTENWERFER and | ) |
| KATE MARIE BARTENWERFER, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

### MEMORANDUM DECISION FOLLOWING REMAND

On December 22, 2017, the Bankruptcy Appellate Panel of
the Ninth Circuit (the "BAP") issued a decision (Dkt. 179; the
"BAP Decision") that, among other things, vacated and remanded
in part this court's judgment of April 19, 2016 (Dkt. 70, as
amended by Dkt. 125 and Dkt. 143; the "Judgment"). The
Judgment declared a debt owed to Mr. Kieran Buckley by Chapter
7 Debtors David and Kate Bartenwerfer nondischargeable under
section 523(a)(2)(A)[1]. The BAP Decision affirmed the Judgment

_____
[1] Unless otherwise indicated, all statutory citations shall refer to Title 11
of the United States Code, aka the "Bankruptcy Code."

as to Mr. Bartenwerfer but vacated and remanded the Judgment as to Mrs. Bartenwerfer so that the court could determine whether Mrs. Bartenwerfer "knew or had reason to know of Mr. Bartenwerfer's fraudulent omissions" in connection with the sale of a house to Mr. Buckley (the "Remanded Issue"). [BAP Decision, 22:23-25.]

After a delay caused by the parties' respective appeals from the BAP Decision and this court's need for additional briefing, the court reopened the evidentiary record to accept additional testimony on the Remanded Issue, which the parties elicited at a trial conducted on December 12, 2018.

**A.  Background**

For the sake of brevity, the court will not repeat but incorporates by reference the relevant facts set forth in its Memorandum Decision of April 1, 2016 (Dkt. 69), which explain the origins and nature of the parties' dispute.  The court also incorporates by reference (to the extent relevant) the BAP Decision's recitation of the procedural posture of this action.

**B.  Jurisdiction**

This proceeding requests a determination of the dischargeability of a debt under section 523(a)(2)(A) and constitutes a core proceeding in which this court may enter a final judgment.  28 U.S.C. § 1334(b); 28 U.S.C. § 157(a); 28 U.S.C. § 157(b)(2)(I); General Order No. 24 of the United States District Court for the Northern District of California.

**C.  Findings of Fact as to Remanded Issue**

When Mr. and Mrs. Bartenwerfer acquired the home located at 549 28th Street, San Francisco, California (the "Property"),

they intended to remodel it.  At first, their plans were relatively modest.  Later, however, after Mr. Bartenwerfer became (according to Mrs. Bartenwerfer) "inspired," those plans morphed into a gargantuan project that involved tearing off the back wall of the Property and increasing its square footage by approximately one third.  Mr. Bartenwerfer assumed full-time responsibility for managing these extensive renovations, even though he had no training or education in construction and did not possess a contractor's license.

At all times relevant to this action, Mrs. Bartenwerfer worked elsewhere.  She currently works at Genentech.  At the time of the original trial of this action, she had worked at McKesson for approximately ten years.  Her work at both places was and remains largely the same.  She works in Genentech's Law Department, assisting with licensing and regulatory issues. She has no specialized legal training, other than that which she might have obtained through her on-the-job experience.

In 2008, Mrs. Bartenwerfer obtained a California real estate broker's license.  She obtained this license after studying books and other materials she obtained from some unspecified source; she attended no classes.  After completing the required coursework, she took an exam.  Although she failed this exam the first time she took it, she ultimately passed and received her license.

Mrs. Bartenwerfer never "used" her broker's license, explaining that she never associated her license with a real estate agency and never once acted as a broker for any buyer or seller of real property.  She viewed the real estate business

as too unstable and too risky to pursue as a profession. And although she originally wanted to obtain this license so that she could earn a commission on the sale of the Property, she came to view herself as too inexperienced to take part in what she believed to be a "complicated" real estate transaction. When she and Mr. Bartenwerfer sold the Property to Mr. Buckley, they engaged Mr. Peter Monti as their agent. Mrs. Bartenwerfer no longer holds an active broker's license.

Mr. and Mrs. Bartenwerfer lived in the Property until approximately April 2007, when the renovations made continued use of the Property as a residence impossible. Mrs. Bartenwerfer could not recall setting foot on the Property between April 2007 and approximately November 2007, when they put the Property on the market. This means that she never used the renovated Property as her residence. She never kept clothes in the new master closet, never slept in the new master bedroom, etc.

Managing the renovation of the Property was Mr. Bartenwerfer's full-time job. Mrs. Bartenwerfer never interacted with or gave instructions to laborers or contractors; never met with or gave instructions to architects; never wrote checks to contractors; etc. Mr. Henry Karnilowicz, a consultant employed to assist Mr. Bartenwerfer with obtaining necessary construction permits, abating violations, and obtaining approval of the construction at the Property, corroborated this aspect of Mrs. Bartenwerfer's testimony. Mr. Karnilowicz only ever dealt with Mr. Bartenwerfer – never with

Mrs. Bartenwerfer – regarding the many outstanding permits and notices of violations pertaining to the Property.

In November 2007, as they prepared to market the Property for sale, Mr. and Mrs. Bartenwerfer executed a Real Estate Transfer Disclosure Statement, as well as a supplement thereto (Plaintiff's Ex. 2; the "TDS")[2]. Mrs. Bartenwerfer admitted that she understood that the purpose of the TDS was to disclose any defects or problems associated with the Property of which a potential purchaser might want to be aware. She also understood that her signature on the document constituted her representation that the information disclosed in the TDS was true and correct. And she understood that she had a duty to update the TDS if any new material information came to light.

Even though Mr. and Mrs. Bartenwerfer attested in the TDS that they answered the questions therein in "an effort to fully disclose all material facts relating to the Property" and certified that "the information provided [was] true and correct," the TDS failed to disclose numerous significant problems. As detailed in the court's April 1, 2016 Memorandum Decision, the TDS failed to disclose several leaks, quite a few open permits, at least one notice of violation, several malfunctioning windows, and a missing fire escape. [Dkt. 69; pp. 11-19.]

The TDS is a "check-the-box" form, with only a very few places in which narrative information can be added. For example, item A requires the seller to disclose whether the

---

[2] When Mr. and Mrs. Bartenwerfer executed the TDS, they had not yet married, so Mrs. Bartenwerfer is identified in and executed the TDS as Kate Pfenninger.

given property has certain fixtures, systems, or features.  The seller accomplishes this by checking a box next to each specified feature or fixture that exists in the property to be sold.  For example, if the property has "Washer/Dryer Hookups," the seller will check the box next to that feature.  He or she will do the same for other features or systems, such as smoke detectors, garbage disposal, dishwasher, fireplace(s), sump pump, central heating, etc.

The TDS also requires the seller to disclose whether he or she is aware of certain defects or problems by checking either a box marked "yes" or a box marked "no."  If the seller checks the "yes" box – thereby confirming the existence of a particular defect or problem – he or she then must check other boxes that indicate the area where the problem exists, such as "roof(s)" or "windows" and then describe the problem in a short section that allows for a narrative answer.

In response to all questions relevant to this dispute, i.e., all questions that afforded Mr. and Mrs. Bartenwerfer an opportunity to disclose the numerous defects from which the Property suffered, they answered "no."  Their omission from the TDS of these significant issues gave rise to a decade of litigation.

During the December 12 trial, Mrs. Bartenwerfer's testimony revealed that she did not remember much about when and how the TDS was prepared, other than that she did not play any significant role in doing so.  She did not, for example, remember signing the TDS, authorizing Mr. Bartenwerfer to

prepare the TDS, or even whether it was Mr. Bartenwerfer who
did so.

During the court's original trial, which took place on
January 19 and 22, 2016, Mr. Bartenwerfer denied having
completed the TDS on his wife's behalf.  This directly
contradicted the testimony he gave during the 19-day state
court trial that preceded the bankruptcy litigation, in which
he admitted that he prepared the TDS on behalf of himself and
Mrs. Bartenwerfer.  The court sees no need to revisit its prior
finding that Mr. Bartenwerfer completed the TDS.  The question,
however, is what did Mrs. Bartenwerfer do, if anything, to
verify the information disclosed in the TDS and then, assuming
she tried to verify those disclosures, whether that effort was
sufficient to insulate her from a finding of
nondischargeability due to Mr. Bartenwerfer's fraudulent
omission of material information.

During the December 12 trial, Mrs. Bartenwerfer testified
that, to the best of her recollection, the TDS was prepared
during a visit to the Property in November 2007, at which she,
Mr. Bartenwerfer, and their agent, Mr. Monti, were present.
She consistently and credibly testified that she verified
whatever information she could by visually inspecting the
Property during that visit, such as, for example, confirming
visually that the Property had a dishwasher and a range.  For
everything else, she relied on Mr. Bartenwerfer to confirm
orally the accuracy of the information disclosed in the TDS.

Mr. and Mrs. Bartenwerfer also signed a sales contract, in
which they represented that they had "no knowledge or notice

that the Property has any material defects other than as
disclosed . . . in the [TDS] or other writing before Acceptance
or as soon thereafter as practicable." [Plaintiff's Ex. 1,
¶ 19.] Mrs. Bartenwerfer admitted that she understood
paragraph 19 of the sales contract when she signed it.

Mrs. Bartenwerfer did not take any steps to confirm what
Mr. Bartenwerfer told her. She did not, for example, ask to
see any construction plans or drawings pertaining to the
renovation of the Property, which might have revealed the
missing fire escape. She did not ask to review any of the
permits pertaining to the construction work done on the
Property nor did she speak to Mr. Karnilowicz (the permit
consultant), which might have revealed the falsity of the
affirmative representations in the TDS that there were no open
permits pertaining to the renovation. She did not review
quotes or invoices from contractors working on the Property,
which might have revealed that, just a month prior to their
execution of the TDS, Mr. Bartenwerfer had received a quote for
work to repair existing leaks and to prevent their recurrence.

When asked whether she saw any problems with the
Property's windows, Mrs. Bartenwerfer simply said she "was not
aware of any problems." The court infers from this testimony
that Mrs. Bartenwerfer might have asked Mr. Bartenwerfer
whether there were any problems with the windows, but that she
did not attempt to open or shut the windows herself, which
might have revealed that they did not operate properly.

Other than the information she confirmed with a visual
inspection, Mrs. Bartenwerfer based her attestations in the TDS

on what Mr. Bartenwerfer told her.  Unfortunately, much of what
Mr. Bartenwerfer told her – and much of the information
disclosed in the TDS – was false, and Mr. Bartenwerfer knew it
was false when he prepared the TDS.  He also did nothing to
correct the TDS over the ensuing months, as they marketed the
Property, or when Mr. Buckley made an offer to and ultimately
did purchase the Property, or after that transaction closed.

Mrs. Bartenwerfer's reliance on Mr. Bartenwerfer continued
through discovery in this proceeding.  For example, Mr. Buckley
served Mrs. Bartenwerfer with interrogatories, one of which
asked her to "[p]lease explain in detail why [she] did not
believe [her] representations regarding water leaks at the
Property were false when the representations were made."
[Plaintiff's Ex. 37, pp. 13-14 (Interrogatory No. 1 and
Response).]  In response, Mrs. Bartenwerfer stated:  "During
construction, a problem was discovered with the roofing
material above the master bedroom closet.  That problem was
resolved during the construction process and the responding
party did not consider the problem to be a 'leak' of the sort
for which disclosure was required since it occurred during the
construction of the Property and was resolved during the
construction of the Property.  Responding party was not aware
of any other problem [sic] related to water intrusion or
leaks."  [Id.]

Similarly, Interrogatory No. 11 asked Mrs. Bartenwerfer to
"[p]lease explain in detail why [she] did not believe that
[she] failed to disclose the true status of permits at the
Property with the intention and purpose of deceiving [Mr.

Buckley]." [Plaintiff's Ex. 37, p. 16.] Mrs. Bartenwerfer responded: "Responding party believes the true status of the permits at the Property was disclosed to [Mr. Buckley]. Responding party was not obligated to provide copies of the final permits and, in any event, unable to provide copies of the permits to [Mr. Buckley] because responding party need [sic] to maintain control of the same were for [sic] the City and County of San Francisco to provide final approval of the permits." [Id.]

Mrs. Bartenwerfer verified under penalty of perjury that her responses to Mr. Buckley's interrogatories were "true of my own knowledge, except as to matters which are therein stated upon my information and belief, and as to those matters, I believe them to be true." [Plaintiff's Ex. 37, p. 22.] Mrs. Bartenwerfer did not qualify her responses to Interrogatory Nos. 1 and 11 as based on information and belief; thus, one should be able to accept her responses as based on her own personal knowledge. Except that – assuming one believes her testimony – they were not.

If one accepts Mrs. Bartenwerfer's testimony as truthful, these responses could not have been based on her personal knowledge. She never lived in the renovated Property; she never saw and did not possess or maintain the construction permits; she never interacted with contractors, laborers, architects, or consultants; she never asked for or reviewed construction plans or drawings; and she never asked for or reviewed invoices or estimates for construction work. According to Mrs. Bartenwerfer's testimony, Mr. Bartenwerfer

served as her sole source for information concerning the Property, other than what she could verify visually.

When confronted with her responses to the foregoing written discovery during the December 12 trial, Mrs. Bartenwerfer waffled. She claimed that she intended her responses – which were clearly drafted as hers and hers alone – to be interpreted as both hers and Mr. Bartenwerfer's. This feeble explanation does nothing for her credibility.

All of that said, the court believes that Mrs. Bartenwerfer told the truth on the stand. She answered questions earnestly, taking care to ask for clarification when needed. And she consistently, clearly, and credibly maintained – perhaps to her detriment – that, when confronted with a question concerning the Property about which she had no personal knowledge and as to which she could not determine an answer based on her visual inspection, she asked Mr. Bartenwerfer and relied unflinchingly on whatever he told her.

**D. Conclusions of Law as to Remanded Issue.**

Mr. Buckley's complaint contained a single cause of action, based on section 523(a)(2)(A). Section 523(a)(2)(A) excepts from discharge any debt obtained by "false pretenses, a false representation, or actual fraud." To obtain a finding of nondischargeability under section 523(a)(2)(A), a creditor must prove by a preponderance of the evidence that: (1) the debtor made a fraudulent misrepresentation or omission, or engaged in deceptive conduct; (2) the debtor knew of the falsity or deceptiveness of his or her statements or conduct; (3) the debtor made the representation with the intention and purpose

of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor suffered damage as a proximate result of the debtor's fraudulent statements or conduct.  In re Slyman, 234 F.3d 1081, 1085 (9th Cir. 2000).

The BAP affirmed this court's conclusion that Mr. Buckley succeeded in proving all of the foregoing elements as to Mr. Bartenwerfer.  [BAP Decision, 23:16-19.]  As relevant to this decision, the BAP vacated this court's Judgment as to the Remanded Issue.

In their supplemental briefing on the Remanded Issue, it became clear that the parties no longer seriously dispute that Mrs. Bartenwerfer had no actual knowledge of Mr. Bartenwerfer's fraud.  They remain in dispute as to whether she "should have known" of his fraud.  And they both offered argument that strayed from the Remanded Issue.

Mr. Buckley characterizes Mrs. Bartenwerfer's attitude toward the truth about the Property's condition as "indifferent".  He points out (correctly) that the court received no evidence that Mrs. Bartenwerfer could not have reviewed the permits, construction drawings, invoices, or other relevant documents; or that she could not have spoken to contractors or to others, such as Mr. Karnilowicz, concerning the Property.  According to Mr. Buckley, had Mrs. Bartenwerfer paid "minimal attention" to the facts to which she attested, she would have become aware of their falsity.

Mr. Buckley also contends that Mrs. Bartenwerfer can be held directly liable for the misrepresentations made to Mr. Buckley because she:  (a) signed the TDS without doing the

proper due diligence; and (b) failed to disclose that many of the representations she made in the TDS were not based on personal knowledge. [Plaintiff's Scienter Brief re Kate Bartenwerfer, Dkt. 187, pp. 19-24.] According to Mr. Buckley, this "grossly reckless" behavior satisfies section 523(a)(2)(A)'s scienter requirement and affords a basis upon which to render the debt nondischargeable that does not require imputation of Mr. Bartenwerfer's fraud to Mrs. Bartenwerfer. The court respectfully declines to address arguments beyond the Remanded Issue. The BAP did not invite the parties to offer or this court to consider new theories relating to Mrs. Bartenwerfer's knowledge or intent.

Mrs. Bartenwerfer characterizes herself as an "honest but unfortunate" debtor. She believes she acted reasonably by asking Mr. Bartenwerfer to confirm the representations he made (and that she adopted as her own) and argues that this constituted the "minimal attention" required of her under relevant caselaw. She maintains that she would not have known, for example, how to read construction drawings or permits even if she had asked for them, so doing so would not have enabled her discovery of the falsity of Mr. Bartenwerfer's representations as to the Property's condition.

Mrs. Bartenwerfer also continues to argue that she and Mr. Bartenwerfer were not partners. [Defendants' Brief re Knowledge and Intent of Kate Bartenwerfer, Dkt. 189, pp. 9-12.] This, too, strays from the Remanded Issue and ignores the BAP's express affirmation of this court's finding that Mr. and Mrs.

1  Bartenwerfer were partners with respect to the Property. [BAP

2  Decision, 22:9-20.][3]

3      The Remanded Issue is limited to whether Mrs. Bartenwerfer

4  knew or should have known of her husband's fraud, such that it

5  can be imputed to her for purposes of section 523(a)(2)(A).

6  The seminal case in the Ninth Circuit on the issue of

7  imputation of fraud is In re Huh, 506 B.R. 257 (B.A.P. 9th Cir.

8  2014) (en banc).  Huh involved an action under section

9  523(a)(2)(A) that arose from the sale of a retail market.  The

10  debtor, Mr. Huh, was a licensed real estate broker and operated

11  a real estate and business brokerage.  Mr. Kim worked as a

12  part-time sales agent associated with Mr. Huh's brokerage.  Mr.

13  Kim served as the seller's agent in the transaction involving

14  the market.

15      During the negotiations leading up to the sale, Mr. Kim

16  made numerous misrepresentations to the buyer as to the

17  profitability of the market and the extent of its inventory.

18  He also failed to disclose that local authorities had cited the

19  market for several fire and health code violations and that,

20  unless the buyer took immediate and expensive corrective

21  measures, he would be unable to obtain a license to operate the

22  business.

23  _____

24  [3] "We agree with the bankruptcy court's agency finding.  Mrs. Bartenwerfer's
    partnership/agency relationship with Mr. Bartenwerfer was established by not

25  only her co-ownership of the Property, which is a factor tending to establish
    partnership, but also because she signed the TDS and sales contract and she

26  stood to benefit from the successful completion of the project and sale of the
    Property.  That she participated little in the project and delegated authority

27  to Mr. Bartenwerfer to manage it does not defeat the forming of a partnership.
    A partnership can exist as long as the parties have the right to manage the
    business, even though in practice one partner relinquishes the day-to-day

28  management to the other partner."  (citations omitted)

After the worst-case scenario played itself out and the buyer was forced to sell the market at a substantial loss, he sued Mr. Kim in state court and won. During post-trial litigation, the buyer succeeded in adding Mr. Huh as a defendant and in obtaining a judgment against him in an amount that exceeded $900,000. Mr. Huh then filed a petition for relief under Chapter 7.

The buyer/judgment-creditor commenced an adversary proceeding in which he asked the bankruptcy court to except his judgment from Mr. Huh's discharge. After trial, the bankruptcy court concluded that Mr. Kim was Mr. Huh's agent but declined to impute Mr. Kim's fraud to Mr. Huh. In support of its conclusion, the bankruptcy court noted, among other things, that Mr. Huh had never communicated directly with the buyer; had never made any affirmative misrepresentations to the buyer or instructed Mr. Kim to make any misrepresentations on his behalf; that Mr. Huh knew nothing about the market; and that Mr. Huh had not even been aware of the market or its purchase until after that transaction closed. The bankruptcy court entered judgment in favor of Mr. Huh.

The BAP affirmed. 506 B.R. at 259. The BAP held that imputation of an agent's fraud to the agent's principal requires proof of the principal's culpability, i.e., that the principal knew or should have known of the agent's fraud. Id. at 271-272. Considering the factual findings made by the bankruptcy court as to Mr. Huh's lack of knowledge of the transaction and of Mr. Kim's fraud, the BAP concluded that the bankruptcy court had correctly decided that the buyer's state

court judgment should not be excepted from discharge.  <u>Id.</u> at 272.

Huh does not explicitly obligate a debtor to pay "minimal attention" to his or agent's representations or conduct to avoid imputation of the agent's fraud.  In fact, <u>Huh</u> does not discuss what efforts, if any, a debtor must make to avoid a finding that he or she *should have known* of the agent's fraud and does not describe what Mr. Huh did or did not do to supervise Mr. Kim's conduct.  The caselaw followed by <u>Huh</u>, however, provides some meaningful guidance.

<u>Huh</u> adopted the rule announced by the Eighth Circuit Court of Appeals in <u>Matter of Walker</u>, 726 F.2d 452 (8th Cir. 1984). <u>Walker</u> involved an action under section 523(a)(2)(A) against a debtor whose wife made fraudulent misrepresentations to a bank for the purpose of inducing the bank to loan more money than it otherwise would have to the debtor's business.  The parties did not dispute that the debtor's wife served as his agent.

The bankruptcy court held that this agency relationship, as well as the fact that both husband and wife enjoyed the benefit of the fraudulently obtained funds, justified imputation of the wife's fraud to her debtor/husband.  The district court disagreed, reasoning that, in order hold a debtor liable for his agent's fraud, the party seeking a declaration of nondischargeability must prove that the debtor knew or should have known of the fraud.  The Eighth Circuit agreed with the district court's "knew or should have known" standard but reversed and remanded because it found the factual

record developed in the bankruptcy court inconclusive as to that issue.  726 F.2d at 454.

In discussing the "should have known" component of the standard to which it adhered, the Eighth Circuit briefly examined cases in which courts had imputed an agent's fraud to a debtor.  It found that in each such case, the debtors were found to be "recklessly indifferent" and possessed "no reason, good or bad, for their lack of knowledge." Id. (citations omitted).  The Eighth Circuit held that "[t]he debtor who abstains from all responsibility for his affairs cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud." Id.  Huh quotes this language and adopts wholesale Walker's "knew or should have known" standard,[4] so it is fair to say that the BAP also approves of the guidance offered by Walker as to whether a debtor "should have known" of his or her agent's fraud.

The court could find no caselaw from within the Ninth Circuit that discusses the "should have known" prong of the Walker rule.  Decisions from courts in other jurisdictions that follow Walker and/or its "knew or should have known" standard, however, prove helpful.

Helena Chem. Co. v. Richmond (In re Richmond), 429 B.R. 263 (Bankr. E.D. Ark. 2010) involved a creditor's demand for (among other things) a declaration of nondischargeability under section 523(a)(2)(A).  The creditor had loaned money to one or more of the debtor's businesses, which the debtor's son

---

[4] Huh, 506 B.R. at 266.

managed.  The Debtor orally relinquished managerial responsibility to his son, rather than documenting that delegation in accordance with the applicable corporate governance documents.  The debtor did this because he knew of his son's serious financial problems and wished to conceal those problems from creditors.

Unfortunately, the debtor's son persisted in his financial misconduct while running his father's businesses.  He made material misrepresentations to the plaintiff/creditor concerning the existence and ownership of certain equipment that was to serve as the creditor's collateral; fraudulently inflated cash, inventory, and receivables; and willfully failed to disclose intercompany debt.  He also concealed the businesses' insolvency through an elaborate check-kiting scheme.

While the bankruptcy court received some evidence that proved the father's direct involvement in a small portion of his son's fraudulent activities, for the most part the debtor did little to supervise his son.  He signed whatever checks and other documents his son placed before him; failed to monitor bank accounts; and never attempted to verify the accuracy of tax returns, financial statements, loan applications, and other documents his son prepared on his behalf.

The creditor argued that the bankruptcy court should impute the son's fraud to his father/debtor.  The debtor attempted to distance himself from his son's misconduct, pleading ignorance to most of it.  The bankruptcy court agreed with the creditor, emphasizing that the debtor knew of his

son's insolvency, tax problems, and pattern of financial mismanagement but nevertheless gave him carte blanche. Richmond, 429 B.R. 290-291. According to the bankruptcy court, this justified a judgment in favor of the creditor under section 523(a)(2)(A). Id. at 295.

In Warthog, Inc. v. Zaffron (In re Zaffron), 303 B.R. 563 (Bankr. E.D.N.Y. 2004), a creditor that had leased a large conference center to an entity through which the debtor and his partner conducted business demanded a judgment of nondischargeability under section 523(a)(2)(A) as to the debt arising from the lease. Prior to execution of the lease, the debtor's partner made numerous misrepresentations concerning financing commitments he and the debtor had received from banks and other investors; commitments from alleged clients as to use of the conference center; and as to the debtor's experience as an investment banker. The partner made some of these misrepresentations the debtor's presence, but the debtor made no effort to correct them. As to the partner's other false statements, the debtor claimed ignorance.

The bankruptcy court declared the debt nondischargeable. The court found it "difficult to believe that based on the actual facts as the Debtor knew them to be" the creditor would have leased such large premises to the debtor and his partner without representations as to financing. It also noted the debtor's failure to correct the false representations made in his presence. This "reckless indifference" to the truth justified a judgment in favor of the creditor under section 523(a)(2)(A). Id. at 572-573.

In <u>Am. Inv. Bank, N.A. v. Hosking</u> (<u>In re Hosking</u>), 89 B.R. 971 (Bankr. S.D. Fla. 1988), the debtor obtained a loan from a bank so that he could invest in an oil drilling venture. The debtor authorized his financial advisor and accountant to prepare the documents required by the bank, which the debtor understood would include a financial statement and loan application. The debtor's agents prepared the necessary documents, but they contained numerous materially false representations. The debtor maintained that he did not read or sign the documents his agents prepared but admitted to asking his agents to prepare those documents; admitted to needing the loan to invest in the oil drilling venture; and admitted to acknowledging in writing that the bank's decision to extend credit was based in part on a loan application and his financial status.

The bankruptcy court did not believe the debtor's testimony that he did not sign the loan application or financial statement. But even accepting that testimony as true, the court found ample evidence upon which to conclude that the debtor knew or should have known of his agents' fraud. The court emphasized the debtor's intelligence and experience as a businessman, as well as his admissions concerning the documentation required by the bank. By abandoning his responsibilities as a loan applicant and paying no attention to the activities of his agents, the debtor behaved recklessly, which justified a judgment in favor of the bank. <u>Hosking</u>, 89 B.R. at 977.

In each of the foregoing cases, the debtor knew of – but ignored – facts and circumstances that should have prompted him to investigate the truth of representations made by his agent. In Hosking, the debtor knew that obtaining a loan would require a financial statement and loan application and authorized his agents to prepare them, but made no effort to find out what those documents actually said.  In Richmond, the debtor knew of his son's history of financial mismanagement but nevertheless signed whatever documents the son placed before him without verifying their accuracy.  In Zaffron, the debtor understood that the lessor would require proof of significant financial backing and knew that his company did not have such backing, but made no effort to investigate the representations made by his partner.  In each of these cases, the debtor's willful refusal to pay minimal attention to the activities of their agents amounted to reckless indifference.  Under Walker, such culpability justifies imputation of the agents' fraud to the debtors and a finding of nondischargeability under section 523(a)(2).

The case before this court does not follow the foregoing pattern.  Mrs. Bartenwerfer did not live at the Property after the relevant renovations started.  Once she moved out, she did not visit the Property again until she, Mr. Bartenwerfer, and Mr. Monti met there to prepare the TDS.  She never met with or gave instructions to any of the laborers, contractors, architects, or other professionals hired by Mr. Bartenwerfer. She played no role in obtaining permits for the construction or in working with municipal authorities with respect to those

permits.  She and Mr. Bartenwerfer agreed that he would assume
full-time responsibility for the Property and its renovation
and they stuck to that arrangement.

In light of their arrangement, the court finds Mrs.
Bartenwerfer's conduct reasonable with respect to the
representations made in the TDS.  She confirmed visually
whatever information she could.  As to disclosures that were
not subject to visual verification, she asked Mr. Bartenwerfer
to confirm their veracity.  It was, after all, his full-time
job to supervise the construction.

While Mr. Bartenwerfer did not possess a contractor's
license and had no training in construction, the court does not
believe these facts render Mrs. Bartenwerfer's conduct any less
reasonable, and certainly not reckless.  Mr. Bartenwerfer
devoted himself full-time to the Property; Mrs. Bartenwerfer
logically assumed that his first-hand knowledge provided the
most immediate and accurate source of information concerning
its condition.

And the court received no evidence whatsoever that
suggested Mrs. Bartenwerfer might have received any hint of
defects in the Property through other channels.  Put another
way, Mr. Buckley did not prove that Mrs. Bartenwerfer knew of
but ignored facts that should have prompted her to investigate
the representations set forth in the TDS beyond asking Mr.
Bartenwerfer to confirm the accuracy of information she could
not verify herself by visual inspection.

And finally, the court does not believe that the fact Mrs.
Bartenwerfer could have asked, but did not, to review permits,

construction drawings, invoices, checks, or other documents requires a difference result. Nothing in <u>Huh</u>, <u>Walker</u>, or any of the other relevant caselaw requires a debtor to independently verify each and every representation made by his or her agent. If debtors were held to such a standard, it would render debtors liable for all misrepresentations made by their agents – a standard the BAP has rejected. <u>Huh</u>, 506 B.R. at 266. The <u>Walker</u> standard implicitly acknowledges that a principal must be able to trust and rely on his or her agent unless the principal knows or has reason to know of cause not to, and rightfully so. Otherwise, there would be little point to principal-agent relationships. It is only where a debtor learns of facts that require investigation into the agent's conduct but fails to undertake such an inquiry that a court can find that the debtor "should have known" of the agent's fraud and can impute such fraud to the debtor. Mr. Buckley failed to prove that Mrs. Bartenwerfer knew of any such facts.

### E. Conclusion

For the foregoing reasons, the court will render judgment on Mr. Buckley's complaint in favor of Mrs. Bartenwerfer.

**\*\*END OF ORDER\*\***

## Court Service List

[None]